UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICANA WORLDWIDE CORPORATION,<br>      Plaintiff<br><br>      v.<br><br>PROTRADE LOGISTICS CORPORATION and JOSE J. BENITEZ,<br>      Defendants | No. 22 CV 3095<br><br>Judge Jeremy C. Daniel |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on a pair of motions for summary judgment. The defendants move for summary judgment on the plaintiff's breach of contract, state and federal trade secret, and tortious interference claims. (R. 90.) The counter-defendants move for summary judgment on counter-plaintiff Jose Benitez's breach of contract and Illinois Wage Payment and Collection Act claims. (R. 93.) For the reasons given in this order, the Court grants-in-part and denies-in-part both motions.

**BACKGROUND**

The plaintiff, also counter-defendant, American Worldwide Corporation ("AWW"), is a specialized freight broker for trade show exhibitions and displays. (R. 138 (Defendants' Response to Plaintiff's Statement of Additional Facts ("Defs.' Resp.

PSOAF")) ¶ 1.)[1] The parties agree that this is a "niche market" with a limited clientele. (*Id.* ¶¶ 2–4.) AWW is owned and was founded by counter-defendant Mark Kengott. (R. 110 (Counterclaim-Plaintiff's Response to Counterclaim-Defendant's Statement of Material Facts ("Countercl. Pl.'s Resp. CDSOF")) ¶ 2.)

The defendant and counter-plaintiff, Jose Benitez, worked for AWW from January 2015 until May 14, 2021. (*Id.* ¶ 4.) When he left AWW, he started defendant company Protrade Logistics Corporation ("Protrade"). (R. 114 (Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Resp. DSOF")) ¶ 3.) Beyond these basic facts, the parties vigorously dispute the course of events.

According to AWW, it has developed an extensive list of trade secrets concerning its "specialized know-how" in delivering exhibits to convention centers and other trade show sites. (R. 115 (Plaintiff's Statement of Additional Facts ("Pl. SOAF")) ¶¶ 5–6.) This information is kept on its information technology system, which uses "industry standard" firewalls and password protection to limit access to authorized users. (*Id.* ¶ 7.) Among these authorized users was Benitez, who rose through the ranks at AWW to become Director of Operations. (*Id.* ¶ 8–12.) On February 14, 2019, Benitez signed an "Employee Non-Compete, Confidentiality and Non-Solicitation Agreement" (the "Agreement"). (*Id.* ¶ 15; R. 1 ¶ 38.)

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate. For documents filed under seal, the Court cites the sealed version of the documents while attempting not to reveal any information that could be reasonably deemed confidential. Confidential information is discussed to the extent necessary to explain the path of the Court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

The COVID-19 pandemic "caused the tradeshow business to essentially shut down." (Pl. SOAF ¶ 13.) Kengott assigned Benitez to work with an outside vendor to create proprietary software for "tradeshow shipping." (*Id.*) Around the same time, approximately March 18, 2020, AWW's information technology professional, Peter Rutecki, allegedly discovered that Benitez had created a private email account "made to appear as if it were an AWW email." (*Id.* ¶ 21.) AWW alleges that Benitez was using this email account to conduct business for AWW, and was also "saving and storing numerous AWW confidential documents, including lists of clients and other technical information relating to those clients, on his personal Google drive." (*Id.* ¶¶ 23–25.) According to AWW, Benitez could provide no satisfactory explanation for these actions. (*Id.* ¶¶ 22, 26.) After Benitez left AWW to start Protrade, Rutecki re-examined Benitez's computer and found that Benitez had deleted his AWW email account and all his emails, and was unable to recover the deleted information. (*Id.* ¶¶ 33–35.) According to AWW, after Benitez left its employ, he kept access to and/or ownership over documents containing AWW trade secrets, and used those trade secrets to attempt to "poach" AWW customers. (*Id.* ¶¶ 42–62.) AWW accuses Benitez of not informing long-term customers that he had left AWW, leading them to hire Protrade when they thought they were hiring AWW. (*Id.* ¶ 49.) Some of these customers invoiced AWW for work performed by Protrade. (*Id.*)

Benitez tells a very different story. According to him, there were no internal controls over who could access AWW documents, and the alleged trade secrets were nothing more than "information [] generally known in the freight business and easily

3

determined by individuals in the industry." (R. 138-1 ¶¶ 3–4.) Furthermore, according to Benitez, he transferred certain AWW documents to Google cloud files as early as 2015 for easier collaboration across AWW's operations team. (*Id.* ¶¶ 4–6.) AWW employees with access to these Google cloud files included "other members of the Operations team, salesmen, and Mark Kengott." (*Id.* ¶ 6) Benitez asserts that in March 2020, Rutecki changed ownership of these documents from Benitez to Kengott, but Benitez retained access permission until after he left AWW. (*Id.* ¶¶ 7, 13.) Benitez generally denies misappropriating AWW confidential information or trade secrets, poaching customers, or misleading Protrade customers into thinking they were hiring AWW. (*See generally* Defs.' Resp. PSOAF.)

Benitez also alleges further facts in support of his counterclaims. He alleges that AWW and Kengott agreed to pay him an $80,000 annual salary for 2019, plus a $14,000 bonus for his work during 2019. (R. 110[2] (Counterclaim-Plaintiff's Statement of Additional Material Facts (Countercl. Pl.'s SOAF ¶ 7)). He alleges this bonus was never paid, and that in March 2020, AWW and Kengott reduced his salary without warning. (*Id.* ¶ 9–10.) AWW and Kengott, for their part, assert that they did discuss a pandemic related salary cut with Benitez, and further assert that the bonus payment was discretionary, not obligatory. (R. 133 (Counterclaim-Defendant's Response to Counter-Plaintiff's Statement of Additional Facts ("Countercl. Defs.' Resp. C. Pl's SOAF") ¶¶ 7–10.)

---

[2] R. 110 contains two separate documents: Benitez's Response to AWW's Statement of Material Facts ("Countercl. Pl.'s Resp. CDSOF"), and Benitez's Statement of Additional Material Facts ("Countercl. Pl.'s SOAF").

4

AWW sued Benitez and Protrade, alleging that when Benitez left AWW, he took AWW confidential information and trade secrets, and has used that information to improperly solicit AWW clients and interfere with AWW's ongoing business relations. (*See generally* R. 1.) AWW alleges this violated the Agreement. (*Id.* ¶ 17.) AWW brings four counts: breach of contract (Count I), violation of the Federal Defend Trade Secrets Act ("DTSA") 18 U.S.C. § 1836, *et seq.* (Count II), violation of the Illinois Trade Secrets Act ("ITSA") 765 Ill. 1065/1, *et seq.* (Count III), and Tortious Interference with Business Relations (Count IV). (*Id.* ¶¶ 37–76.)

Benitez counter-sues, alleging that AWW and Kengott failed to pay him his full salary after March 2020, failed to pay him his owed bonus for 2019, and failed to pay out his unused vacation time when he left AWW. (*See generally* R. 20.) Benitez argues these failures violate the implicit employment contract he had with AWW (Count I), as well as the Illinois Wage Payment and Collection Act, ("IWCPA") 820 ILCS 115/1, *et seq.* (Count II).

Benitez and Protrade move for summary judgment as to AWW's claims. (R. 90.) AWW and Kengott move for summary judgment as to Benitez's counterclaims. (R. 93.)

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717,

5

722 (7th Cir. 2015). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the Court "construe[s] all facts and draw[s] all reasonable inferences in the nonmoving party's favor, but the moving party may prevail 'by showing an absence of evidence to support' the nonmoving party's claims." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)). While the Court must give the nonmoving party "the benefit of reasonable inferences from the evidence," it does not construe "speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). Where both sides move for summary judgment, "all reasonable inferences are drawn in favor of the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017) (citing *Dunnet Bay Constr. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015)).

## ANALYSIS

The Court begins with Benitez's and Protrade's motion for summary judgment on AWW's breach of contract, trade secrets, and tortious interference claims, and then addresses summary judgment as to Benitez's counterclaims for breach of contract and violations of the IWCPA against AWW and Kengott.

### I. BREACH OF CONTRACT (COUNT I)

Benitez moves for summary judgment on Count I, arguing that the non-compete and confidentiality provisions of the Agreement are invalid for overbreadth,

6

and that these provisions cannot be severed from any valid portion of the contract. (R. 98 at 26–27.)

### A. Non-Compete Clause

Benitez argues that the non-compete provisions of the Agreement are "overreaching and unenforceable." (R. 98 at 28.) He also argues that, because the non-compete provisions are "essential" to the Agreement, the entire contract is unenforceable. (*Id*. at 29) The Agreement is governed by Illinois law. (R. 90-6 at 6.) Under Illinois law, a non-compete provision is upheld "if it contains a reasonable restraint," as assessed by a three-part test. *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011). The restrictions in the non-compete must be "(1) [] no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) [must] not impose undue hardship on the employee-promisor, and (3) [] not injurious to the public." *Id*.

Here, the non-compete provisions of the Agreement last for five years, and restrict Benitez from, *inter alia*, owning, operating, being employed by, or "hav[ing] any other interest" in any business which competes with AWW. (R. 90-6 at 4.) Benitez cannot, "directly or indirectly . . . participate in any transportation-intermediary business that provides services anywhere in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services[.]" (*Id*.) These are fatally overbroad restrictions.

Looking first at whether the restrictions are "no greater than is required for the protection of a legitimate business interest," *Reliable Fire Equip. Co.,* 965 N.E.2d

7

at 396, the Court concludes they are not. When asked, Kengott, AWW's owner and CEO, could not articulate why the restrictions lasted for five years, nor why Benitez was banned from the entire freight industry. (Pl.'s Resp. DSOF ¶¶ 18, 19.) Instead, AWW admits that Kengott went with "what the [his] lawyer called for" and "what AWW's lawyers recommended." (*Id.*) However, Kengott also swore in his affidavit that "[t]radeshow focused transportation providers" like AWW "consist of less than 0.001% of U.S. based transportation providers." (R. 115-1 at 77–78; *see also* Defs.' Resp. PSOAF ¶¶ 2–4 (both sides agree AWW is in a "niche market").) The disjunction here is obvious—if AWW is in such a highly specialized, niche industry, why the need to exclude Benitez from the entire "shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management" industry? Kengott provided no explanation, and therefore there is no legitimate business interest protected by such a sweeping ban.

Second, the restrictions impose an undue hardship on Benitez. By banning him from working for any "shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management" company, in any role, (R. 90-6 at 4), the Agreement renders Benitez "virtually unemployable in his field of occupation as well as other related fields." *N. Am. Paper Co. v. Unterberger*, 526 N.E.2d 621, 624 (Ill. App. Ct. 1988). Such broad, sweeping restrictions are contrary to public policy because they interfere with Benitez's "fundamental right to use his general knowledge and skills to pursue the occupation for which he is best suited." *George S. May Int'l Co. v. Int'l Profit Assocs.*, 628 N.E.2d 647, 653 (Ill. App. Ct. 1993); *see also*

8

*Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l Inc.*, 616 F. Supp. 2d 805, 818 (N.D. Ill. 2009) (non-compete invalid when it would prevent district sales manager from working as, for example, a cashier).

### B. Severability

The Court next considers whether the unenforceable portion of the Agreement can be severed from the rest of the contract. Courts may sever unenforceable portions of a contract at their discretion where "the stricken portion is not essential to the bargain" of the contract. *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 277 (Ill. 2006). The Court must consider whether the "provisions operate independently of each other" or whether the invalid provisions are so "closely connected" to the rest of the contract that severing them "would be tantamount to rewriting the Agreement." *Abbott-Interfast Corp. v. Harkabus*, 619 N.E.2d 1337, 1344 (Ill. App. Ct. 1993); *see also Hwang v. Pathway LaGrange Prop. Owner, LLC*, 2024 IL App (1st) 240534, ¶ 28, __ N.E. 3d __ (Ill. App. Ct. 2024) ("Courts should be cautioned against [severing invalid provisions] as it discourages the narrow and precise draftsmanship which should be reflected in written agreements.") (cleaned up).

Also relevant, the Agreement has a severability clause, (R. 90-6 at 6), which "indicates that the parties intended for the valid portions of the contract to remain in effect even in the absence of any unenforceable provisions." *Kinkel v. Cingular Wireless, LLC*, 828 N.E.2d 812, 823 (Ill. App. Ct. 2005), *aff'd*, 857 N.E.2d 250 (Ill. 2006). However, a severability clause is not the end of the matter. In Illinois, severability clauses can be overridden by provisions deeming certain portions as

9

"essential" to the agreement as a whole. *Hill v. Names & Addresses, Inc.*, 571 N.E.2d 1085, 1100 (Ill. App. Ct. 1991).

Benitez argues that the non-compete provisions are the essential portion of the Agreement, and that the confidentiality provisions must rise and fall with them. (R. 98 at 29.) The Agreement states that "Employee, [Benetiz] therefore, acknowledges and agrees that what Employee learns and is trained in at AW[W] would necessarily cause unfair competition if Employee took employment competitive to AW[W]." (R. 90-6 at 1.) Benitez argues this language is sufficient to render the non-compete and confidentiality portions of the Agreement inseparable. However, the cases cited by the defendants are not entirely persuasive. They cite *Del Monte*, which concerned a contract with a clause declaring the noncompete clause "essential" to the contract, similar to the contract in *Hill*. 616 F. Supp. 2d at 819. The Agreement contains no such clause. The defendants also cite to *Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, an out-of-district case applying Illinois law where the court did not sever a confidentiality provision from an invalid non-compete provision because of similar language to the Agreement here. No. CV 17-5009, 2022 WL 4706702, at *9 (D. Minn. Sept. 30, 2022). But there is no discussion in *A.W. Companies* about a severability clause. *Id.*

AWW, for its part, did not argue severability in its opposition to summary judgment, and therefore waives any arguments it might have raised. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.")

Though the Court acknowledges the distinctions between the defendants' cited cases and the facts before it now, on the whole, the Court concludes that the non-compete and confidentiality provisions run together and must fall together. The Agreement, read as a whole, is a single contract written by AWW with the intent of keeping what it sees as its intellectual property away from potential competitors. In other words, the non-compete is designed to keep Benitez away from AWW's competitors not because of his unique skills, but because of his special knowledge of AWW's internal processes, which AWW views as confidential trade secrets. (R. 90-6 at 6 ("[Benitez] engaging in any form of employment relationship with a Competing Business . . . would necessarily result in [him] revealing, basing judgments and decisions upon, or otherwise using AW[W]'s Confidential Information to unfairly compete with AW[W]").) This means that the non-compete and confidentiality provisions are not severable, and since the non-compete is fatally overbroad, the confidentiality provision must fall as well. To the extent AWW intended to bring a claim based on the non-solicitation agreement, that too is invalid for the same reasons.

Accordingly, summary judgment is appropriate for Benitez on Count I.

## II. TRADE SECRETS (COUNTS II AND III)

Benitez and Protrade move for summary judgment on AWW's trade secret claims, arguing that AWW's "customers are not trade secrets, and there is no evidence" they misappropriated AWW's customer identities. (R. 98 at 18.) AWW responds that its customer list is a misappropriated trade secret, and further alleges

that the customer list was not the only trade secret misappropriated by Benitez and Protrade. (R. 113 at 12.)

AWW brings two claims of misappropriation of trade secrets: Count II under the federal DTSA, 18 U.S.C. § 1831 *et seq.*, and Count III under the ITSA, 765 ILCS 1065/1 *et seq*. (R. 1 ¶¶ 42–71.) The elements of both the federal and state claim are, as relevant here: "(1) a trade secret existed; (2) the secret was misappropriated through improper acquisition, disclosure, or use; and (3) the owner of the trade secret was damaged by the misappropriation." *Brian J. Wanca, J.D., P.C. v. Oppenheim*, 226 N.E.3d 732, 741 (Ill. App. Ct. 2023) (elements of a claim under the ITSA); *see also Got Docs, LLC v. Kingsbridge Holdings, LLC,* 657 F. Supp. 3d 1034, 1043 (N.D. Ill. 2023) (elements of a claim under the DTSA).

Because Benitez and Protrade challenge whether a trade secret exists, the Court starts with the first element. The definition of a trade secret is "materially identical" under state and federal law. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540–43 (7th Cir. 2021). "[I]nformation qualifies as a 'trade secret' if (1) 'the owner thereof has taken reasonable measures to keep such information secret' and (2) 'the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Id.* (citing 18 U.S.C. § 1839(3)). This is a factual question requiring an "ad hoc evaluation" of the circumstances. *Id.*

12

Benitez and Protrade argue that the only trade secret at issue here is a list of AWW's customers. (R. 98 at 17 ("[T]he only trade secret misappropriation for which AWW seeks damages is the identity of its customers.").) According to Benitez and Protrade, these customers either had a pre-existing relationship with John McCarthy,[3] an AWW employee who left to work (as an independent contractor) with Protrade, or are well-known "exhibit houses" that do business with many freight brokers, of which AWW was only one. (R. 98 at 19–20.) McCarthy's business relationships cannot be AWW's trade secrets, the defendants argue, because those relationships pre-date his employment by AWW, and AWW never had McCarthy execute a confidentiality agreement. (*Id*.) Benitez and Protrade likewise argue that the identities of the "exhibit house" customers cannot be trade secrets because these companies are well known in the trade show industry and regularly solicit bids from many freight brokers. (*Id*.) In so far as these arguments go, they are compelling. But, they do not provide grounds for summary judgment because AWW's case rests on different trade secrets entirely.

AWW alleges that Benitez and Protrade misappropriated three documents containing confidential information: its "Operations Manual," its "Line Up," and its "Short List." (R. 113 at 13–15.) The Operations Manual allegedly contains a "full

---

[3] AWW moves to strike McCarthy's affidavit because Protrade did not make him available for deposition. (R. 116.) In the same motion, AWW moves to strike three other affidavits from affiants it alleges were never disclosed by Protrade (*Id*.) Protrade argues that, because McCarthy is an independent contractor, he is not Protrade's witness to produce, and "AWW's failure to depose Mr. McCarthy cannot be blamed on Protrade." (R. 139 at 7.). Protrade also argues that the other three affiants were nevertheless known to AWW. (*Id*.) Because the Court was able to resolve the cross-motions for summary judgment without reference to the disputed affidavits, the Court denies AWW's motion to strike as moot.

training guide" for how AWW operates, using all the knowledge the company gained over years of operations. (*Id*. at 16.) The Line Up is a "comprehensive" summary of "virtually every job AWW has ever done" including costs, job details, customer contacts, and internal notes by AWW employees. (*Id*. at 13.) Last, the Short List contains a large number of specialized vendors, convention center contacts, and client contacts, organized into tabs based on geography and service needed. (*Id*. at 16.) AWW states it purchased the original Short List from its first director of operations when the company was founded in 1989. (*Id*. at 15.) AWW maintains it limits access to these documents through restrictive IT access to documents based on employee need. (*Id*. at 18.) This, it argues, is reasonable for a company of its size. (*Id*.)

Benitez and Protrade argue that AWW cannot save its case at the "[eleventh] hour" by "rais[ing] additional supposed trade secrets." (R. 137 at 12–13.) But they put no evidence before the Court that AWW ever limited its trade secret claims to just the customer list. Benitez and Protrade support their argument that this case is limited to just AWW's customer list by citing their own Statement of Undisputed Material Fact No. 99. (R. 98 at 17–18.) This statement reads "AWW contends that the identity of the following entities with which [the defendants] did business with are trade secrets:" and then lists the fifteen entities. (R. 99 at ¶ 99.) The evidentiary support for this statement is AWW's December 6, 2024 "Supplemental Response to Protrade Logistic Corp.'s Supplemental Interrogatory [No.] 2." (*Id*.) This interrogatory asks "[i]f you contend that Protrade or Jose Benitez did business with any [AWW] client the identity of which is a trade secret, identify the specific [AWW]

14

client, and state the date(s) on which you contend that Protrade did business with that client." (R. 99-1.) This interrogatory is not a request that AWW identify the trade secrets it alleges the defendants misappropriated. So, AWW's response does not support the argument that the only trade secrets in this case are those listed in the response. Furthermore, the complaint identifies trade secrets such as "operating policies and procedures," "methods, plans, and processes," "client and vendor preferences," "AWW's Load Management System," and other enumerated information, which mirrors AWW's arguments in opposition to summary judgment. (R. 1 at ¶¶ 43, 58.) Benitez and Protrade have simply failed to make a summary judgment motion that addresses AWW's trade secret claims.

In their reply in support of summary judgment, Benitez and Protrade argue that the trade secrets AWW identifies are nevertheless not trade secrets, nor misappropriated. (R. 137 at 18.) These arguments are newly presented in their reply and accordingly are waived. *Carroll v. Lynch*, 698 F.3d 561, 568 (7th Cir. 2012).

Benitez's and Protrade's motion for summary judgment is denied as to Counts II and III.

### III. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS (COUNT IV)

On Count IV, Benitez and Protrade argue summary judgment is appropriate because the ITSA displaces any claim under Illinois law for tortious interference claims based on misappropriated trade secrets. (R. 98 at 32.) AWW responds that its tortious interference claims are not based on misappropriated trade secrets. Instead, the company alleges that once Benitez left AWW, he continued to accept work from AWW customers who thought they were hiring AWW. (R. 113 at 24.) AWW, in its

15

brief, alleges this was discovered when AWW received invoices for work it never performed. (*Id.*) Benitez and Protrade respond that AWW fails to support these claims with any admissible evidence whatsoever. (R. 137 at 27–28.)

Their point is well taken—AWW's opposition to their motion rests on a single statement: "AWW only learned of this [Benitez accepting work from AWW customers who were intending to hire AWW] when the customers would send invoices to AWW, believing AWW had done the work." (R. 113 at 9 (citing Pl.'s SOAF ¶ 49.) This citation, in turn, is supported by Kengott's affidavit. (*See* Pl.'s SOAF ¶ 49 (citing M. Kengott Aff. ¶ 67.).) Kengott makes no statement in his affidavit about receiving invoices for work not performed. Instead, this paragraph makes several assertions about how Protrade copied AWW's email format, operated email accounts designed to look like AWW accounts, and "essentially trick[ed] customers who were reaching out to AWW for quotes[.]" (R. 115-1 at 87.) As Benitez and Protrade argue, these statements, as written, are of dubious admissibility. (*See* R. 137 at 28 (arguing "there is no evidentiary foundation for [Kengott's] statement which is, at best, hearsay").) Nevertheless, Kengott's affidavit is sufficient to survive summary judgement on this issue.

The burden on a party opposing summary judgment is not onerous. *Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019). To survive, the non-movant must provide some evidence "beyond the pleadings" such as "affidavits, depositions, answers to interrogatories, or admissions on file" demonstrating that there is "evidence upon which a jury could properly proceed to find a verdict in [its] favor." *Id.*

16

(citing *Modrowski v. Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013)). This evidence need not be presented "in a form that would be admissible at trial." *Id*. Accordingly, Kengott's affidavit is sufficient evidence to survive summary judgment on the issue of tortious interference because it supports AWW's assertion that Benitez and Protrade accepted work from AWW customers who were intending to hire AWW.

Benitez's and Protrade's motion for summary judgment is denied as to Count IV.

### IV. BENITEZ'S COUNTERCLAIMS

AWW and Kengott, as counterclaim-defendants, move for summary judgment on Benitez's counterclaims for breach of contract and violations of the IWCPA. Benitez claims that AWW and Kengott breached his employment contract and the IWCPA by "(i) failing to pay Benitez his full salary, beginning in March 2020 through the end of his employment, (ii) failing to pay Benitez the bonus payment to which he was entitled for 2019; and (iii) failing to pay Benitez for the unused vacation days that he had accrued upon the termination of Benitez's employment." (R. 20 ¶ 21, 24).

In Illinois, employment contracts must have "clear and definite" terms and "be supported by consideration." *McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1349 (Ill. 1997). A claim under the IWPCA requires, *inter alia*, some "employment contract or agreement." *Catania v. Loc. 4250/5050 of Commc'ns Workers of Am.*, 834 N.E.2d 966, 972 (Ill. App. Ct. 2005). AWW and Kengott argue that there was never a clear, definite contract or agreement between themselves and Benitez. (R. 93 at 5–6). As such that they could freely cut his salary in March 2020, and any 2019 bonus was

17

discretionary not obligatory. (*Id.* at 7.) Further, AWW and Kengott assert that they paid Benetiz his unused vacation time when he left AWW. (*Id.* at 10.)

Benitez puts forth sufficient factual allegations to mostly survive summary judgment on his contract and IWCPA claims. He alleges that his salary was reduced in March 2020, without prior notice from Kengott. (Countercl. Pl.'s Resp. CDSOF ¶ 10.) But, as Benitez admits in his Statement of Facts, Kengott disagrees, and testified that he gave Benitez advance warning of the salary cut. (*Id.*) This is a classic question of credibility between two witnesses, which cannot be resolved at summary judgment. *See Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013) ("[I]ssues of credibility . . . are for a jury at trial, not a court on summary judgment[.]"). The credibility issue also arises as to the bonus payment: Benitez alleges that he was entitled to a $14,000 bonus for 2019, while Kengott asserts that the bonuses were discretionary. (*Contrast* R. 93-1 ¶ 21 *with* Countercl. Pl.'s Resp. CDSOF ¶ 7). As for the vacation payment claims, again, Benitez and Kengott disagree about what the terms of Benitez's employment were, and neither side puts forth dispositive documents. (*Contrast* R. 93-1 ¶¶ 34-36 *with* Countercl. Pl.'s Resp. CDSOF ¶ 20.)

Nevertheless, the Court can resolve most of Benitez's wage reduction claims. Benitez continued to work at AWW after his pay was cut in March 2020, remaining with the company until May 2021. (R. 20 ¶ 4.) Thus, he ratified the pay cut by accepting continued employment. *See Geary v. Telular Corp.,* 793 N.E.2d 128, 131 (Ill. App. Ct. 2003) ("When an at-will employee continues to work after a change in commission plan, he is deemed to have accepted the change."). Accordingly, AWW

18

and Kengott are entitled to summary judgment on Benitez's wage reduction allegations after March 2020, but Benitez's allegation that he was not given advance notice of his reduction in pay for March 2020 can proceed to a jury.

## CONCLUSION

Benitez's and Protrade's motion for summary judgment [90] is granted as to Count I, for breach of contract, and denied as to Counts II, III, and IV. Kengott's and AWW's motion for summary judgment [93] is granted as to Benitez's allegations his wages were reduced without his consent after March 2020, and denied on all other grounds. On or before July 17, 2025, the parties shall submit a joint status report that includes the anticipated length of trial and any trial conflicts in December 2025 and January 2026.

Date: July 3, 2025

JEREMY C. DANIEL
United States District Judge